UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
03 DEC -8 PM 1:01
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| MICHAEL B. PRICE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. CV-03-S-1868-S |
| ) | |
| TIME, INC.; and DON YAEGER, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

Plaintiff, Michael B. Price, who briefly was the head football coach at the University of Alabama, commenced this action in the Circuit Court of Jefferson County, Alabama on June 20, 2003. He asserted state law claims of libel, slander, and outrageous conduct for allegedly false and defamatory statements uttered by defendant Don Yaeger during a May 6, 2003 interview on the "Paul Finebaum Radio Show," and penned by Yaeger in a *Sports Illustrated* magazine article published by defendant Time, Inc. on May 8, 2003.[1]

Defendants timely removed the action to this court on July 22, 2003, on the basis of the court's diversity jurisdiction. *See* 28 U.S.C. §§ 1332(a)(1), 1441, 1446. The action presently is before the court on plaintiff's renewed motion to compel defendants to answer several interrogatories.[2] In particular, plaintiff seeks disclosure of the identities of unnamed

---

[1] *See* plaintiff's state court complaint, appended to doc. no. 1 (Notice of Removal), at 1 & ¶ 1. The article containing the allegedly libelous statements was included in the *Sports Illustrated* edition bearing the printed issue date of May 12, 2003, but the magazine actually was distributed to consumers on May 8, 2003.

[2] Plaintiff filed a motion to compel on September 18, 2003, which was denied for failure to comply with Federal Rule of Civil Procedure 37(a)(2). *See* doc. nos. 8 & 9; see also doc. no. 5 (Initial Order Governing All Further Proceedings), § IV(B), at 7 ("The parties are reminded that Fed. R. Civ. P. 37(a)(2) requires that any motion to compel discovery requires a certification that the movant has in good faith



sources cited and quoted by Yaeger in his radio interview and the article he authored for *Sports Illustrated* magazine.

The published article, entitled "Bad Behavior: How He [Coach Price] Met His Destiny At A Strip Club," primarily was an account of activities allegedly occurring on April 16 and 17, 2003, in Pensacola, Florida. According to the article, while plaintiff was in Pensacola for a golf tournament, he visited an adult entertainment club known as "Arety's Angels." While at the club, Coach Price allegedly invited a dancer employed by the club named Lori Boudreaux, who also was known by the stage name of "Destiny," to meet him in his hotel room later that evening. Ms. Boudreaux allegedly declined, saying that her husband would meet her at the end of the shift. The article goes on to recount the following events:

> At about midnight Price headed back to the hotel. He eventually met up with two women, both of whom he had earlier propositioned for sex, *according to one of the women, who agreed to speak to SI [Sports Illustrated] about the hotel-room liaison on the condition that her name not be used.* The woman, who declined comment when asked if she was paid for the evening, said that the three-some engaged "in some pretty aggressive sex." She said that at one point she and her female companion decided to add a little levity to the activity: "We started screaming 'Roll Tide!' and he was yelling back, 'It's rolling, baby, it's rolling.'" (Reached on his cellphone on Sunday, Price said that he visited Arety's only once on April 16 — after the sponsors' dinner —

---

conferred, or attempted to confer, with the party not making the disclosure in an effort to secure disclosure without court action. *Failure to include a certificate of conference will result in the motion being denied on its face for failure to comply with the procedures of this court.*") (emphasis supplied). Plaintiff subsequently filed a notice of refiling the motion to compel, demonstrating compliance with Rule 37(a)(2); even so, the notice bore the stamped facsimile of plaintiff's counsel's signature, rather than an original signature as required by Federal Rule of Civil Procedure 11, and that motion also was denied. *See* doc. nos. 10 & 11. Plaintiff finally filed a notice of refiling the motion to compel bearing plaintiff's counsel's original signature on October 9, 2003 (*see* doc. no. 13), and that is the motion before the court.

and denied having sex with two women in his hotel room or even inviting anyone to the room.)

The next morning, *according to the woman interviewed by SI*, she got up early and left the hotel before Price departed for his eight o'clock tee time.[3]

The article also reported that,

[a]ccording to a source close to the athletic department, Price had already been chastised twice by athletic director Mal Moore for spending time buying drinks for students and "generally serving as the life of the party in too many bars."

In fact, two Alabama students spoke to SI on Monday about an incident that apparently led to one of Moore's conversations with Price. According to one of the students, a few weeks after Price was hired, the coach went to Buffalo's American Grille near campus and, after four hours of drinking, propositioned some female students. "I heard him tell several girls who he was buying drinks for that his wife was still in Washington and he wanted them to come to his room at the GameDay Condos," one of the student sources said. "One of the girls lives at GameDay, and when we went by there at 2:30 a.m., he was stumbling around and told us he had forgotten the entry code [he needed] to get up in the elevator. One girl offered to help, and he tried to talk her into coming to his condo. Everyone was kind of shocked."[4]

Plaintiff seeks to compel defendants to disclose the identities of witnesses providing information in connection with the foregoing accounts of plaintiff's conduct.[5]

Defendants have objected to such disclosure on two grounds. First, they assert that the source of a reporter's information is privileged and, thus, shielded from disclosure by the following state statutory provision:

---

[3]Doc. no. 15 (Plaintiff's Brief in Support of Motion to Compel Discovery), Ex. 1, at 42 (emphasis added).

[4]*Id.* at 42, 44.

[5]Although plaintiff seeks to compel disclosure of the identity of the unnamed sources for each of these accounts, his argument focuses on the identity of the person who was the source of information concerning the events described as occurring in his Pensacola, Florida, hotel room.

3

> **§ 12-21-142. Exemption of news-gathering persons from disclosing sources.**
>
> No person engaged in, connected with or employed on any newspaper, radio broadcasting station[,] or television station, while engaged in a news-gathering capacity, shall be compelled to disclose in any legal proceeding or trial, before any court or before a grand jury of any court, before the presiding officer of any tribunal or his agent or agents[,] or before any committee of the Legislature or elsewhere[,] the sources of any information procured or obtained by him and published in the newspaper, broadcast by any broadcasting station, or televised by any television station on which he is engaged, connected with or employed.

Alabama Code § 12-21-142 (1975) (1995 Replacement Volume). Alternatively, defendants contend that the information sought is exempted from disclosure by the qualified, "reporter's privilege" afforded by the First Amendment to the United States Constitution.

## I. DISCUSSION

### A.   Alabama Statutory Privilege

This is a diversity case. *See* 28 U.S.C. § 1332(a)(1). Accordingly, the court must apply state substantive law and federal procedural rules. *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-45 (11th Cir. 1982). Federal Rule of Evidence 501 states:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. *However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or*

4

*political subdivision thereof shall be determined in accordance with State law.*

Fed. R. Evid. 501 (emphasis supplied). Because plaintiff asserts state law claims of libel, slander, and outrageous conduct, privileges recognized under Alabama law are applicable here.

Alabama law has long recognized a privilege which protects the sources of a newspaper reporter's information. The predecessor to the statute presently at issue was referred to as "The Newspaper Privilege" law, and it read as follows:

> **Newspaper employees.** — No person engaged in, connected with or employed on any newspaper while engaged in a news gathering capacity shall be compelled to disclose, in any legal proceeding or trial, before any court or before a grand jury of any court, or before the presiding officer of any tribunal or his agent or agents, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed.

Ala. Code § 7-370 (1940) (quoted in *Ex parte Sparrow*, 14 F.R.D. 351, 352 (N.D. Ala. 1953)). The statute was amended to its present form in 1949, and extended the "newspaper privilege" to persons engaged in, employed by, or connected with radio and television broadcast stations. *See* 1949 Ala. Acts 376.

Plaintiff argues that, because *Sports Illustrated* is a *magazine*, as opposed to a *newspaper*, the privilege does not apply to defendants, or shield the identity of their informant from disclosure. Defendants counter that the statutory term "newspaper" encompasses "magazines," and that there is no principled rationale for distinguishing between persons gathering news to be published in magazines with respect to the

5

applicability of the privilege.

The Alabama Supreme Court summarized "the fundamental rule[s] of statutory construction" in *Norfolk Southern Railway Co. v. Johnson*, 740 So. 2d 392 (Ala. 1999), saying:

> This Court has held that the fundamental rule of statutory construction is to ascertain and give effect to the intent of the Legislature in enacting a statute. *IMED Corp. v. Systems Engineering Associates Corp.*, 602 So. 2d 344, 346 (Ala. 1992). *If possible, a court should gather the legislative intent from the language of the statute itself.* *Advertiser Co. v. Hobbie*, 474 So. 2d 93 (Ala. 1985). If the statute is ambiguous or uncertain, the court may consider conditions that might arise under the provisions of the statute and examine results that would flow from giving the language in question one particular meaning rather than another. *Clark v. Houston County Comm'n*, 507 So. 2d 902, 903-04 (Ala. 1987). The legislative intent may be gleaned from the language used, the reason and necessity for the act, and the purpose sought to be obtained by its passage. *Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County*, 589 So. 2d 687, 689 (Ala. 1991) (citing *Ex parte Holladay*, 466 So. 2d 956 (Ala. 1985)).

*Norfolk Southern Railway*, 740 So. 2d at 396 (emphasis added).

Plaintiff's responsive argument is a syllogism. The major premise is that the Alabama Legislature "could have included magazines or other media [among those entitled to claim the statutory privilege] if it had chosen to do so."[6] The minor premise is that the Legislature specifically limited the privilege to reporters for newspapers, radio broadcasting stations, and television stations. The conclusion drawn by Coach Price from these premises is that Alabama Code § 12-21-142 does not apply to defendants.

Plaintiff correctly states that Alabama Code § 12-21-142 does not explicitly exempt

---

[6]Doc. no. 15 (Plaintiff's Brief in Support of Motion to Compel Discovery), at 2.

persons engaged in, employed by or connected with a *magazine* from compelled disclosure of sources. Plaintiff's argument essentially is one based upon the principle of *expressio unis est exclusio alterius*, which is defined as "[a] canon of construction holding that to express or include one thing implies the exclusion of the other, or of the alternative." *Black's Law Dictionary* (7th ed. 1999), at 602.[7] This principle has long been employed by Alabama courts engaging in statutory interpretation. *See, e.g., Jefferson County v. Alabama Criminal Justice Information Center Commission*, 620 So. 2d 651, 658 (Ala. 1993) ("It is clear that if the legislature had intended to make local governments responsible for the financial needs of the ACJIC, it would have done so when it set out specific duties in the statute."); *City of Birmingham v. Brown,* 241 Ala. 203, 208, 2 So. 2d 305, 309 (Ala. 1941) ("As evidence of the legislature's intent . . ., it is significant to note that the legislature has expressly granted the right of condemnation in aid of some of the uses enumerated in section 2046, impliedly withholding the right in others: Expressio unius est exclusio alterius."); *Smith v. Alabama*, 660 So. 2d 1320, 1324 (Ala. Civ. App. 1995) (statute's specific enumeration of jurisdictional matters while omitting reference to filing fees "implies an intention to exclude other requirements not so included.").

The principle should not be applied uncritically, however:

> A discussion of the *expressio unius* idea is always necessarily accompanied by a discussion of its limitations. The following excerpts suggest that this is

---

[7]*Black's Law Dictionary* provides the following illustration: "For example, the rule that 'each citizen is entitled to vote' implies that noncitizens are not entitled to vote." *Black's Law Dictionary* (7th ed. 1999), at 602.

perhaps a rule honored more in the breach than in the observance:

> The maxim . . . is not of universal, but of limited, use and application. It is an aid to construction, not a rule of law. It is not conclusive, is applicable only under certain conditions, is subject to exceptions, may not be used to create an ambiguity, and requires great caution in its application. 73 Am.Jur.2d, *Statutes*, sec. 212, at 405-06.
>
> [T]he rule is a rule of statutory construction and not a rule of law. Thus it can be overcome by a strong indication of contrary legislative intent or policy. 2A *Sutherland Statutory Construction*, sec. 47.23, at 194 (Sands 4th ed. 1984 rev.).
>
> [T]he maxim is inapplicable if there is some special reason for mentioning one thing and none for mentioning another which is otherwise within the statute, so that the absence of any mention of such other will not exclude it. 82 C.J.S., *Statutes*, sec. 333, at 670.
>
>     Several Latin maxims masquerade as rules of interpretation while doing nothing more than describing results reached by other means. The best example is probably *expressio unius est exclusio alterius*, which is a rather elaborate, mysterious sounding, and anachronistic way of describing the negative implication. Far from being a rule, it is not even lexicographically accurate, because it is simply not true, generally, that the mere express conferral of a right or privilege in one kind of situation implies the denial of the equivalent right or privilege in other kinds. Sometimes it does and sometimes it does not, and whether it does or does not depends on the particular circumstances of context. Without contextual support, therefore, there is not even a mild presumption here. Accordingly, this maxim is best a description, after the fact, of what the court has discovered from context. R. Dickerson, *The Interpretation and Application of Statutes* 234-35 (1975).

*United States v. Castro*, 837 F.2d 441, 443 n.2 (11th Cir. 1988).

Turning to an examination of the statute, the court first observes that the preamble to Alabama Act No. 253 establishing the reporter's privilege states that its purpose was "[t]o

define the obligation of *newspaper employees* when called upon to testify before any court, tribunal, commission or inquest." 1935 Ala. Acts 253 (emphasis supplied). Section Three of the Act further states: "The purpose of this act, is to safeguard and protect the professional confidence of *newspaper* [sic] and *newspapermen*." *Id.* As observed above, the statute was amended in 1949, *broadening* the scope of the privilege to include media other than newspapers — *i.e.*, radio and television broadcasting stations. This fact is significant, because that expansion did *not* include other forms of *print* media.[8]

Moreover, legislatures of other states that have enacted so-called "shield laws" have clearly indicated that reporters employed or engaged by, or connected with, *magazines* may not be compelled to disclose a source of information. For example, the analogous Montana statute provides: "Without his or its consent, no person, including any . . . magazine . . . or any person connected with or employed by any of these for the purpose of gathering, writing, editing, or disseminating news may be examined as to or may be required to disclose any information obtained or prepared or the source of that information in any legal proceeding . . . ." Mont. Code Ann. § 26-1-902 (WESTLAW through 2003 Sess.). Likewise, New Mexico's reporter's privilege states: "Unless disclosure be essential to prevent injustice, no

---

[8]Indeed, television broadcasting was in its infancy in 1949. *See Radio and Television*, at http://www.historychannel.com (last visited December 2, 2003) ("Although experimentation with television broadcasting began in the late 1920s, technical difficulties, corporate competition, and World War II postponed its introduction to the public until 1946 . . . The television boom occurred between 1949, when 940,000 households had a set, and 1953, when the number soared to 20 million."). In contrast, magazines such as the *Atlantic Monthly* and the *Saturday Evening Post* began circulation during the nineteenth century, and *Time, Fortune,* and *Life* were well established during the 1930s. *Magazines and Newspapers*, at http://www.historychannel.com (last visited December 2, 2003).

journalist or newscaster, or working associates of a journalist or newscaster, shall be required to disclose before any proceeding or authority . . . the source of any published or unpublished information for any *medium of communication* to the public." N.M. Stat. Ann. § 38-6-7(A) (WESTLAW through July 16, 2003) (emphasis supplied). The phrase "medium of communication is statutorily defined as "any newspaper, *magazine*, press association, news service, wire service, news or feature syndicate, broadcast or television station or network, or cable television system." *Id.* § 38-6-7(B)(2). Oklahoma's privilege exempts journalists from disclosing a source of information "obtained in the gathering, receiving or processing of information for any medium of communication to the public." Okla. Stat. Ann. § 2506(B)[9] (West, WESTLAW through 2002 Sess.). Again, the Oklahoma legislature defined "medium of communication" as including "any newspaper, *magazine*, other periodical, book, pamphlet, news service, wire service, news or feature syndicate, broadcast station or network, cable television system, or record." *Id.* § 2506(A)(2). Pennsylvania's shield law, which is similar to the Alabama statute, reads as follows:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, or *any magazine of general circulation*, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa. Const. Stat. Ann. § 5942 (West, WESTLAW current through Act 2002-25) (emphasis

---

[9]Section (B) also provides: "This subsection does not apply with respect to the content or source of allegedly defamatory information, in a civil action for defamation wherein the defendant asserts a defense based on the content or source of such information." Okla. Stat. Ann. § 2506(B) (West, WESTLAW through 2002 Sess.).

supplied).[10]

Based upon the foregoing, the court concludes that the Alabama statutory privilege against disclosure of a source does not extend to persons "engaged in, connected with or employed on" a magazine. If the legislature had intended for the scope of the statutory privilege to include magazines or other media, it could have done so clearly and unequivocally.

This conclusion does not, however, end the discussion. Instead, the court must evaluate whether the qualified reporter's privilege emanating from the First Amendment protects Yaeger and Time, Inc., from compelled disclosure of Yaeger's source.

**B.   "Reporter's Privilege" Under the First Amendment**

The United States Supreme Court's decision in *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972), is considered the cornerstone of the so-called, "reporter's privilege." There, the Court examined whether requiring reporters "to appear and testify before state or federal grand juries abridges the freedom of speech and press guaranteed by the First Amendment." *Id.* at 667, 92 S. Ct. at 2649-50. The Court declined to create an absolute testimonial privilege applicable only to reporters, holding that the grand

---

[10]Additionally, Nevada's statutory privilege extends to "reporter[s], former reporter[s] or editorial employee[s] of any newspaper, *periodical* or press association or employee of any radio or television station." Nev. Rev. Stat. 49.275 (West, WESTLAW through 2002 18th Special Sess.) (emphasis supplied). Rhode Island's statute likewise includes the term "periodical." R.I. Gen. Laws § 9-19.1-2 (WESTLAW through Jan. 2002 Sess.) ("[N]o person shall be required . . . to disclose the source of any confidential information received . . . in his or her capacity as a reporter, . . .journalist, writer, . . .or other person directly engaged in the gathering or presentation of news for any accredited newspaper, periodical, press association, newspaper syndicate, wire service, or radio or television station.").

jury's "important [and] constitutionally mandated role" in the government's fundamental function of "[f]air and effective law enforcement aimed at providing security for the person and property of the individual" was paramount to reporters' concerns that the flow of news would be diminished by compelled testimony. *Id.* at 690, 693, 92 S. Ct. at 2660, 2662-63. Even so, the Court's holding was limited to the following circumstances: "Grand juries address themselves to the issues of whether crimes have been committed and who committed them. Only where news sources themselves are implicated in crime or possess information relevant to the grand jury's task need they or the reporter be concerned about grand jury subpoenas." *Id.* at 691, 92 S. Ct. at 2661. In a concurring opinion, Justice Powell confirmed that the Court's holding was limited in scope: "The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Id.* at 709, 92 S. Ct. at 2671.

Following *Branzburg*, courts have recognized a *qualified* reporter's privilege under the First Amendment in various circumstances, the contours of which are detailed as follows:

> In criminal cases, federal courts have generally balanced the competing interests in favor of disclosure. *See, e.g., Baker v. F & F Investment*, 470 F.2d 778 (2d Cir. 1972); *Loadholtz v. Fields*, 389 F. Supp. 1299 (M.D. Fla. 1975). In civil cases, "courts must recognize that the public interest in nondisclosure of journalist's news sources will often be weightier than the private interest in compelled disclosure." *Baker v. F & F Investment Co.*, 470 F.2d 778, 785 (2d Cir. 1972).
>
> Federal courts have held generally that the qualified privilege does not apply when the reporter is being questioned about an incident to which he or she may be a witness like any other member of the public. *See, e.g., Miller v. Mecklenburg County*, 602 F. Supp. 675 (W.D.N.C. 1985); *Alexander v.*

12

> *Chicago Park Dist.*, 548 F. Supp. 277 (N.D. Ill. 1982). In such a case, there is no intrusion into newsgathering or the special functions of the press. *Miller*, 602 F. Supp. at 679.
>
> Federal courts have also examined the type of disclosure requested in balancing the competing interests of a free press and a fair trial. Generally, the more confidential the information sought, the greater the First Amendment protection. *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597, 224 Ct. Cl. 583 (1st Cir. 1980); *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979). Thus, if information was given to a reporter on a promise of confidentiality, a court would be more reluctant to compel a betrayal of such a confidence. Such betrayal would tend to prevent the reporter from obtaining information later which he could then pass on to the public. Consequently, the public has a heightened interest where disclosure of confidential information is sought. *Compare Miller v. Mecklenburg County*, 602 F. Supp. 675 (W.D.N.C. 1985) *with Miller v. Mecklenburg County*, 606 F. Supp. 488 (W.D.N.C. 1985).
>
> Federal courts have also developed an analytical framework for determining whether a reporter is privileged from discovery. In order to invoke the privilege the newspaper reporter must show that he received the information in dispute while engaged in a newsgathering capacity. *Von Bulow by Auersperg v. Von Bulow*, 811 F.2d 136 (2d Cir. 1987). *Once the reporter makes this showing, the party seeking disclosure must meet a three part test in order to compel discovery: (1) the information sought must be relevant, (2) the information sought must not be obtainable by alternative means, and (3) there must be a compelling need for the information. Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980).[11]

*Pinkard v. Johnson*, 118 F.R.D. 517, 520-21 (M.D. Ala. 1987) (emphasis supplied) (footnote omitted).[12]

Turning to the application of the three-part *Miller* test, the first inquiry is whether the

---

[11]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[12]The omitted footnote acknowledged that Alabama Code § 12-21-142 expressed "Alabama's policy of giving protection to confidential 'sources of information' obtained by reporters." 118 F.R.D. at 521 n.3.

information sought is relevant. Plaintiff asserts state law claims of libel and slander, based upon publication of the *Sports Illustrated* article and Yaeger's appearance on the Paul Finebaum Radio Show, during which he was interviewed about the article prior to its publication.[13]

"To establish a prima facie case of defamation, the plaintiff must show that the defendant published a false and defamatory statement concerning the plaintiff to a third person." *Atkins Ford Sales, Inc. v. Royster*, 560 So. 2d 197, 200 (Ala. 2003). In *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), the Supreme Court held that where a plaintiff is a public official, proof of actual malice is required before damages may be awarded. *Id.* at 283, 84 S. Ct. at 727. In *Harte-Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989), the Supreme Court unequivocally confirmed that the *New York Times* "actual malice" standard applicable to *public officials* also applies to *public figures*. *Id.* at 666, 109 S. Ct. at 2685. The Court explained that

> in [*Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094, 1111 (1967)], Justice Harlan had opined that the *New York Times* actual malice standard should be reserved for cases brought by public officials. The *New York Times* decision, in his view, was primarily driven by the repugnance of seditious libel and a concern that public official libel "lay close" to this universally renounced, and long-defunct, doctrine. In place of the actual malice standard, Justice Harlan suggested that a public figure need only make "a showing of highly unreasonable conduct constituting an extreme departure

---

[13]*See* state court complaint, appended to doc. no. 1 (notice of removal). "Libel is defamation where the defamatory words are written or printed; slander is defamation where the defamatory words are spoken. Oral publication of a written defamation constitutes libel, not slander." 50 Am. Jur. 2d *Libel and Slander* § 9 (available on WESTLAW database updated May 2003).

14

>    from the standards of investigation and reporting ordinarily adhered to by responsible publishers." This proposed standard, however, was emphatically rejected by a majority of the Court in favor of the stricter *New York Times* actual malice rule. Moreover, just four years later, Justice Harlan acquiesced in application of the actual malice standard in public figure cases, see *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 69-70 (1971) (dissenting opinion), and by the time of the Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court was apparently unanimously of this view. Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.

*Harte-Hanks Communications*, 491 U.S. at 665-66, 109 S. Ct. at 2685.

>    It is uncontested that plaintiff is a public figure. Accordingly, and in sum, he is
>
>    required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S. Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967). A publisher acts with actual malice when he prints a story with knowledge that it is false or with reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

*Long v. Arcell*, 618 F.2d 1145, 1147 (5th Cir. 1980). Plaintiff thus must establish that the statements contained in the *Sports Illustrated* article were false, and that defendants published those statements with knowledge of their falsity or reckless disregard for the truth. There is no question that the identity of the undisclosed sources is relevant to a determination of the truth or falsity of statements attributed to those sources in the article.

Next, plaintiff must show that the information is not obtainable by alternative means. During defendant Don Yaeger's deposition, the following exchange occurred:

15

> Q. So to make sure I understand your answer earlier, the confidential source who provided you with information about what occurred in the room with Coach Price had direct firsthand knowledge by being either an eyewitness or a participant?
>
> A. That is correct.
>
> Q. How many confidential sources did you have for the room?
>
> A. One.[14]

Later during the deposition, Yaeger was questioned as follows:

> Q. Mr. Yaeger, do you believe there were two women in Coach Price's room at the Crown Plaza?
>
> A. I do, sir.
>
> Q. You believe it strongly?
>
> . . . .
>
> A. I'm satisfied it's the truth.
>
> Q. You spoke to one of those women who is a confidential source?
>
> A. Correct.[15]

The court finds that plaintiff has sufficiently demonstrated the absence of alternative means to obtain the identity of the confidential source. Defendant Yaeger contends that there were two women in the hotel room — his confidential source and possibly a woman named Tracy Bragalia, whose identity he learned only following publication of the article, and to whom

---

[14]Doc. no. 15 (Plaintiff's Brief in Support of Motion to Compel), ex. 2, at deposition pages 286, 486-87.

[15]*Id.* at deposition page 324.

16

he never spoke.[16] Even if plaintiff were able to guess the identity of the confidential source, through a process of elimination or otherwise, nothing requires defendants to confirm that plaintiff's guess is correct. As in *Miller*, "[t]he only way [plaintiff] can establish malice and prove his case is to show that [defendants] knew the story was false or that it was reckless to rely on the informant. In order to do that, he must know the informant's identity." 621 F.2d at 726-27.

For all of these same reasons, the court also finds that plaintiff has established a "compelling interest" in the information. Where, as here, the identity of the source is central to the plaintiff's proof in a libel action — *i.e.*, where the information sought "goes to the heart of the matter" — courts have compelled disclosure. *See Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981); *Miller*, 621 F.2d at 726-27; *Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974); *Garland v. Torre*, 259 F.2d 545, 550 (2d Cir. 1958).

"Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances." *Herbert v. Lando*, 441 U.S. 153, 175, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979) (footnote omitted). The court concludes that those circumstances are present here, and, accordingly, plaintiff's motion to compel is due to be granted.[17]

---

[16]Excerpts of deposition of Don Yaeger, appended to doc. no. 17 (Plaintiff's Supplemental Submission in Support of Motion to Compel), at deposition page 280.

[17]Plaintiff also sought disclosure of any notes that Yaeger took during conversations with the unnamed source. Although Yaeger stated during his deposition that such notes existed, but that he "shipped all [his] notes to New York." *Id.* at deposition page 351. During oral argument conducted on November 19, 2003, however, defendants' counsel advised plaintiff's counsel and the court that no such notes had been located.

## II. CONCLUSION

For all of the foregoing reasons, plaintiff's motion to compel disclosure of the identity of defendants' sources is due to be granted. A separate order consistent with this memorandum order will be entered contemporaneously herewith.

DONE this **8th** day of December, 2003.

_____
United States District Judge