**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

FILED
04 MAY -5 PM 2:35
U.S. OF ALABAMA

| | |
|---|---|
| **MICHAEL B. PRICE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil Action No. CV-03-S-1868-S** |
| | ) |
| **TIME, INC., and DON YAEGER,** | ) |
| | ) |
| **Defendants.** | ) |

### MEMORANDUM OPINION

This action is before the court on defendants' renewed motion for certification of an interlocutory appeal to the United States Court of Appeals for the Eleventh Circuit. Defendants seek an interim review of the memorandum opinion and order entered on December 8, 2003,[1] which found that neither Alabama Code § 12-21-142 nor the First Amendment's "qualified reporter's privilege" exempted defendants from disclosing the identity of confidential sources, and granted plaintiff's motion to compel answers to interrogatories. Defendants' renewed motion is based upon the refusal of the Supreme Court of Alabama to answer the question of state law certified by this court.

For the reasons stated herein, defendants' motion will be granted. The court also concludes *sua sponte* that the December 8, 2003, memorandum opinion and

---

[1] Doc. nos. 21 & 22.



order granting plaintiff's motion to compel are due to be vacated, and the following substituted as the court's ruling on the motion.

## I. PROCEDURAL HISTORY

This action was commenced in the Circuit Court of Jefferson County, Alabama by Michael B. Price, who briefly was head coach of the University of Alabama's football team ("Coach Price" or "plaintiff"). He sued Time, Inc., and Don Yaeger for libel, slander, and outrageous conduct. These claims are based upon allegedly false and defamatory statements uttered by Yaeger during an interview broadcast on sports analyst Paul Finebaum's syndicated radio program, and authored by Yaeger for an article published by Time, Inc., in *Sports Illustrated* magazine.[2] Defendants timely removed the action to this court on July 22, 2003, on the basis of the parties' complete diversity of citizenship and the requisite amount in controversy. *See* 28 U.S.C. §§ 1332(a)(1), 1441, 1446.

Coach Price subsequently filed a motion to compel defendants to answer interrogatories asking for the identities of unnamed sources quoted by Yaeger in his radio interview and *Sports Illustrated* article. Defendants' opposition to the motion was principally based upon the following Alabama statute:[3]

---

[2] *See* plaintiff's state court complaint, appended to doc. no. 1 (Notice of Removal), at 1 & ¶ 1.

[3] In a diversity case, a federal court is bound to apply state substantive law and federal procedural rules. *See, e.g., Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed.

No person engaged in, connected with or employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering capacity, shall be compelled to disclose in any legal proceeding or trial, before any court or before a grand jury of any court, before the presiding officer of any tribunal or his agent or agents or before any committee of the Legislature or elsewhere the sources of any information procured or obtained by him and published in the newspaper, broadcast by any broadcasting station, or televised by any television station on which he is engaged, connected with or employed.

Ala. Code § 12-21-142 (1975) (1995 Replacement Volume).[4]

This court concluded that Alabama Code § 12-21-142 does not apply to *magazine* reporters, but only to reporters "employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering

---

1188 (1938); *National Distillers and Chemical Corp. v. Brad's Machine Products, Inc.*, 666 F.2d 492, 494-95 (11th Cir. 1982). Although evidentiary rules generally are considered matters of procedure, the Federal Rules of Evidence provide otherwise when addressing privileges:

Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. *However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness, person, government, State, or political subdivision thereof shall be determined in accordance with State law.*

Fed. R. Evid. 501 (emphasis supplied).

[4] Alternatively, defendants contended that the information sought was exempted from disclosure by the "qualified reporter's privilege" afforded by the First Amendment to the United States Constitution, but this court rejected that argument in the order and memorandum opinion entered on December 8, 2003, and does so again for the reasons discussed *infra.*

capacity,"[5] and ordered defendants to provide full and complete answers to plaintiff's interrogatories seeking disclosure of the unnamed sources for Yaeger's allegedly false and defamatory statements.[6]

Defendants subsequently filed a motion to alter or amend the court's order or, in the alternative, for certification of the issues raised by plaintiff's motion to the United States Court of Appeals for the Eleventh Circuit,[7] as well as a motion to stay implementation of the order pending appellate review.[8]  The motion to stay was granted, pending consideration of defendants' motion for interlocutory appeal.  This court then directed its Law Clerk to contact all counsel by telephone, and solicit their views on whether it would not be more expeditious and appropriate to certify the question of the scope of Alabama Code § 12-21-142 to the Supreme Court of Alabama in the first instance, rather than to endorse an interlocutory appeal to the Eleventh Circuit which, due to the paucity of interpretive authority, probably would do the same thing.

Defendants then filed a "Supplement to Defendants' Motion to Alter or Amend or, in the Alternative, for Certification for Interlocutory Appeal," specifically

---

[5] *See* doc. no. 22 (memorandum opinion entered Dec. 8, 2003)

[6] Doc. no. 21 (order entered Dec. 8, 2003).

[7] Doc. no. 24.

[8] Doc. no. 23.

-4-

requesting that the court certify the statutory question to the Supreme Court of Alabama in accordance with Alabama Rule of Appellate Procedure 18.[9]  Plaintiff opposed certification of the court's order for an interlocutory appeal to either the Eleventh Circuit or the Supreme Court of Alabama.[10]

In view of the fact that there are no clear, controlling, precedents in the decisions of the Supreme Court of Alabama on this issue, and that its significance extends beyond this case,[11] the court concluded that certification of the question of the scope of Alabama Code § 12-21-142 to the Supreme Court of Alabama was advisable.[12]  Accordingly, the alternative aspect of defendants' supplemental motion

---

[9] Doc. no. 27.

[10] *See* doc. no. 29.

[11] *See, e.g.*, R. Robin McDonald, "Magazine Ordered to Reveal Its Sources," *Fulton County* [Georgia] *Daily Report*, Jan. 9, 2004, at 1; Jay Reeves, "Ruling in Price Lawsuit Raises Issues Over Confidential Sources," *Birmingham News*, Dec. 30, 2003, at 4B.

[12] Certification by a federal court of a question of state law is permitted under Article VI, Section 6.02(b)(3) of the Alabama Constitution of 1901, as amended (providing that "[t]he supreme court shall have original jurisdiction . . . to answer questions of state law certified by a court of the United States"), and Alabama Rule of Appellate Procedure 18, reading, in pertinent part, as follows:

> **(a) When Certified.**  When it shall appear to a court of the United States that there are involved in any proceeding before it questions or propositions of law of this State which are determinative of said cause and that there are no clear controlling precedents in the decisions of the Supreme Court  of this State, such federal court may certify such questions or propositions of law of this State to the Supreme Court of Alabama for instructions concerning such questions or propositions of state law, which certified question the Supreme Court of this State, by written opinion, may answer.
>
> . . . .
>
> **(c) Method of Invoking Rule.**  The provisions of this rule may be invoked

was granted, and the court certified the following question to the Supreme Court of

Alabama:

> DOES THE EXEMPTION FROM DISCLOSING SOURCES OF
> INFORMATION FOUND IN ALABAMA CODE § 12-21-142 APPLY
> TO A PERSON "ENGAGED IN, CONNECTED WITH OR
> EMPLOYED ON ANY" *MAGAZINE*, "WHILE ENGAGED IN A
> NEWS-GATHERING CAPACITY"?

The Supreme Court of Alabama refused to answer the question.[13] This court is thus

left no recourse except that of stepping into the breach.

## II. FACTUAL BACKGROUND

The gravamen of plaintiff's claims against defendants is that the article

published in the *Sports Illustrated* magazine issue distributed to consumers on or

---

by any of the federal courts upon its own motion or upon the suggestion or motion
of any interested party when approved by such federal court.

Ala. R. App. P. 18. Moreover, the Eleventh Circuit has observed that, whenever there is "substantial
doubt about a question of state law upon which a case turns," the issue "should be resolved by
certifying the question to the state supreme court. Resolution in this way avoids the unnecessary
practice of guessing the outcome under state law and offers the state court an opportunity to explicate
state law." *Jones v. Dillard's, Inc.*, 331 F.3d 1259, 1268 (11th Cir. 2003) (citations omitted); *see
also, e.g., Sultenfuss v. Snow*, 35 F.3d 1494, 1504 (11th Cir. 1994) (*en banc*) (Carnes, J., dissenting)
("Only through certification can federal courts get definitive answers to unsettled state law questions.
Only a state supreme court can provide what we can be assured are 'correct' answers to state law
questions, because a state's highest court is the one true and final arbiter of state law.").

[13] *See* doc. no. 35 (order entered Mar. 29, 2004, and providing that "[a] certified question
having been received in the above cause pursuant to Rule 18, Alabama Rules of Appellate
Procedure, this Court respectfully declines to answer the certified question."). The failure of the
Supreme Court of Alabama to address the certified question is, at best, disappointing. When faced
with deference by a federal court to the presumed expertise of the highest court of the state to
provide the "correct" answer to a dispositive question in a significant, high-profile controversy that
pivots upon state law, the Supreme Court of Alabama inexplicably declined comment.

about May 8, 2003,[14] contained false and defamatory statements.  The story, entitled

"Bad Behavior:  How He [Coach Price] Met His Destiny At A Strip Club," contains

an account of activities allegedly occurring on April 16 and 17, 2003, while Coach

Price was in Pensacola, Florida, to participate in a golf tournament.  According to

defendants, the narrative was "pieced together" from "numerous interviews with

people who spent time with or saw Price in Pensacola."[15]  The following extract from

the lengthy story touches upon the salient points.

> On April 16, Price flew from Tuscaloosa to Pensacola aboard the jet of
> Alabama businessman James Lee III, en route to the Emerald Coast
> Classic, a stop on the PGA Champions tour that was to be played that
> weekend.  Price was part of the field for the celebrity pro-am.
>
> The 57-year-old coach had barely hit the ground in Pensacola that
> afternoon when he headed to Arety's Angels, one of the city's six strip
> clubs, settled at a table not far from the main stage and started buying
> drinks for dancers, according to two witnesses interviewed last week by
> SI [*Sports Illustrated*].  "He introduced himself as Mike," said waitress
> Amanda York.  "But I love Alabama football, and I knew who he was.
> So later I leaned down and called him 'Coach.'  He just held his finger
> to his lips as if to say, 'Don't tell.'"
>
> According to the two witnesses, Price spent most of his time that
> afternoon buying dances from and drinks for Lori (Destiny) Boudreaux,
> a 36-year-old married mother of two who has worked in strip clubs for
> 15 years.  "He offered to buy me a drink and asked me to sit with him,"
> Boudreaux told SI.  "I offered him a table dance.  He tipped me $60.

---

[14] The article containing the allegedly defamatory statements was included in the *Sports Illustrated* issue bearing the printed date of May 12, 2003, but the magazine actually was distributed to consumers on May 8, 2003.

[15] Doc. no. 15 (Plaintiff's Brief in Support of Motion to Compel Discovery), Ex. 1, at 40.

Then he asked me to take him to the semiprivate dance area. He got a little bad there. We have rules, and touching is not allowed."

Boudreaux said Price told her that he was married and had kids but never mentioned what he did for a living. "He told me I was the most beautiful woman he'd ever seen," Boudreaux said. "He kept telling me he had a room at the [Crowne Plaza] Hotel, and he wanted me to meet him there late that night. He was definitely persistent. I told him my husband was coming to pick me up after work, which he did, by the way."

. . . .

At about midnight Price headed back to the hotel. He eventually met up with *two women*, both of whom he had earlier propositioned for sex, *according to one of the women, who agreed to speak to SI about the hotel-room liaison on the condition that her name not be used*. The woman, who declined comment when asked if she was paid for the evening, said that *the threesome* engaged "in some pretty aggressive sex." She said that at one point *she and her female companion* decided to add a little levity to the activity: "We started screaming 'Roll Tide!' and he was yelling back, 'It's rolling, baby, it's rolling.'" (Reached on his cellphone on Sunday, Price said that he visited Arety's only once on April 16 — after the sponsors' dinner — and denied having sex with two women in his hotel room or even inviting anyone to the room.)

The next morning, *according to the woman interviewed by SI, she got up early and left the hotel before Price departed for his eight o'clock tee time.*[16]

The article also reported other incidents related to Coach Price's alleged behavior in Tuscaloosa, Alabama. For example,

[a]ccording to a source close to the athletic department, Price had

---

[16] *Id.* at 40, 42 (emphasis added).

-8-

already been chastised twice by athletic director Mal Moore for spending time buying drinks for students and "generally serving as the life of the party in too many bars."

In fact, two Alabama students spoke to SI on Monday about an incident that apparently led to one of Moore's conversations with Price. According to one of the students, a few weeks after Price was hired, the coach went to Buffalo's American Grille near campus and, after four hours of drinking, propositioned some female students. "I heard him tell several girls who he was buying drinks for that his wife was still in Washington and he wanted them to come to his room at the GameDay Condos," one of the student sources said. "One of the girls lives at GameDay, and when we went by there at 2:30 a.m., he was stumbling around and told us he had forgotten the entry code to get up in the elevator. One girl offered to help, and he tried to talk her into coming to his condo. Everyone was kind of shocked."[17]

Although plaintiff seeks to compel defendants to disclose the identities of the unnamed sources for all of the events described above, his argument focuses on the identity of the woman who was the source of information about activities that allegedly occurred in his Pensacola hotel room during the late evening and early morning hours of April 16–17, 2003.

## III. DISCUSSION

A "privilege" generally is defined as a "special legal right, exemption, or immunity granted to a person or class of persons; an exception to a duty." *Black's Law Dictionary* 1215 (7th ed. 1999).[18] At common law, a reporter did not possess a

---

[17] *Id.* at 42, 44.

[18] *See also* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 693 (2d ed. 1995) (defining privilege as "a slippery legal word most commonly denoting a person's legal freedom to

privilege to conceal the identity of confidential sources of information obtained in the course of newsgathering activities, and could be compelled to disclose such sources in a legal proceeding before a court, grand jury, or other governmental body. *See, e.g., Branzburg v. Hayes*, 408 U.S. 665, 685, 92 S. Ct. 2646, 2659, 33 L. Ed. 2d 626 (1972) ("At common law, courts consistently refused to recognize the existence of any privilege authorizing a newsman to refuse to reveal confidential information to a grand jury."); *see also id.* at 698, 92 S. Ct. at 2665 ("[T]he common law recognized no such privilege.").

The common law position is rooted in a fundamental precept: *each person summoned as a witness in a legal proceeding is under a duty to answer the subpoena, and to testify truthfully about those relevant facts known to the witness.* The Supreme Court characterized this rule as an "ancient proposition of law" in *United States v. Nixon*, 418 U.S. 683, 709, 94 S. Ct. 3090, 3108, 41 L. Ed. 2d 1039 (1974), a case implicating a privilege of confidentiality claimed by no less a person than an incumbent President of the United States.[19]

---

do or not to do a given act").

[19] *See also, e.g.,* 4 *The Works of Jeremy Bentham* 320-21 (J. Bowring ed. 1843):

Are men of the first rank and consideration—are men high in office—men whose time is not less valuable to the public than to themselves—are such men to be forced to quit their business, their functions, and what is more than all, their pleasure, at the beck of every idle or malicious adversary, to dance attendance upon every petty cause? Yes, as far as it is necessary, they and everybody. . . . Were the Prince of

In sum, "the public . . . has a right to every man's evidence, except for those persons protected by a constitutional, common-law, or statutory privilege," *Branzburg*, 408 U.S. at 688, 92 S. Ct. at 2660 (citations and quotation marks omitted), and "exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *Nixon*, 418 U.S. at 710, 94 S. Ct. at 3108 (footnote omitted); *see also, e.g., Trammel v. United States*, 445 U.S. 40, 50, 100 S. Ct. 906, 912, 63 L. Ed. 2d 186 (1980) (privileges "strictly construed").

Every exception carved out of the common law principle has been "grounded in a substantial individual interest which has been found, through centuries of experience, to outweigh the public interest in the search for truth." *United States v. Bryan*, 339 U.S. 323, 331, 70 S. Ct. 724, 730, 94 L. Ed. 884 (1950); *see also Ex parte Rudder*, 507 So. 2d 411, 414 (Ala. 1987) (observing that evidentiary privileges "protect interests or relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice").

---

Wales, the Archbishop of Canterbury, and the Lord High Chancellor, to be passing by in the same coach, while a chimney-sweeper and a barrow-woman were in dispute about a halfpennyworth of apples, and the chimney-sweeper or the barrow-woman were to think proper to call them for their evidence, could they refuse it? No, most certainly.

-11-

The common-law maxim was reiterated in the rules of evidence promulgated by the Supreme Court of Alabama in 1996, which provide that:

> Except as otherwise provided by constitution or statute or by these or other rules promulgated by the Supreme Court of Alabama, *no person has a privilege to*:
>
> (1)   refuse to be a witness;
>
> (2)   *refuse to disclose any matter*;
>
> (3)   refuse to produce any object or writing; or
>
> (4)   prevent another from being a witness or disclosing any matter or producing any object or writing.

Ala. R. Evid. 501 (emphasis supplied).

## A.      Alabama's Statutory Privilege

The Alabama Legislature created an evidentiary privilege protecting the sources of a *newspaper* reporter's information from compelled disclosure during the 1935 regular session, saying that:

> No person engaged in, connected with or employed on any *newspaper* while engaged in a news gathering capacity shall be compelled to disclose, in any legal proceeding or trial, before any court or before a grand jury of any court, or before the presiding officer of any tribunal or his agent or agents, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed.

Act of Aug. 21, 1935, No. 253, § 2, 1935 Ala. Acts 649 (emphasis supplied)

(subsequently codified at Ala. Code Tit. 7, § 370 (1940)).  The preamble to Act No.

253 stated its purpose as "defin[ing] the obligation of *newspaper employees* when

called upon to testify before any court, tribunal, commission or inquest."  *Id.*

(emphasis supplied).  The third section of the Act elaborated the legislature's intent

in the following manner:  "The purpose of this act, is to safeguard and protect the

professional confidence of [a] *newspaper* and *newspapermen*."  *Id.*

The scope of this statutory privilege was expanded in 1949, to include persons

employed as reporters for electronic broadcasting media.

> No person engaged in, connected with or employed on any
> newspaper, *radio broadcasting station or television station*, while
> engaged in a news-gathering capacity, shall be compelled to disclose in
> any legal proceeding or trial, before any court or before a grand jury of
> any court, before the presiding officer of any tribunal or his agent or
> agents or before any committee of the Legislature or elsewhere the
> sources of any information procured or obtained by him and published
> in the newspaper, broadcast by any broadcasting station, or televised by
> any television station on which he is engaged, connected with or
> employed.

Act of Aug. 9, 1949, No. 376, § 1, 1949 Ala. Acts 548 (emphasis supplied) (now

codified at Ala. Code § 12-21-142 (1975) (1995 Replacement Volume)).  One notable

aspect of this legislative amendment lies in the fact that television was in its infancy

in 1949,[20] whereas magazines such as the *Atlantic Monthly* and *Saturday Evening*

---

[20] *See Radio and Television*, at http://www.historychannel.com (last visited May 3, 2004)
("Although experimentation with television broadcasting began in the late 1920s, technical
difficulties, corporate competition, and World War II postponed its introduction to the public until

*Post* began national circulation during the Nineteenth Century, and *Time, Fortune,* and *Life* were well established by the 1930s.[21] As a consequence, the failure of the Alabama Legislature to expand the scope of the statutory privilege to include reporters for additional forms of *print media* may be a significant omission. Plaintiff contends that it is.[22]

Plaintiff's argument essentially is based upon the canon of statutory construction known as *expressio unis est exclusio alterius*, which provides that the expression or inclusion of one thing in the text of a statute "implies the exclusion of the other, or of the alternative." *Black's Law Dictionary* 602 (7th ed. 1999).[23] Stated differently, those subjects not specifically designated by statutory language should not be implied by a court in the guise of "construction." *See, e.g., Fedorenko v. United States*, 449 U.S. 490, 512-13, 101 S. Ct. 737, 750-51, 66 L. Ed. 2d 686 (1981) ("We are not at liberty to imply a condition which is opposed to the explicit terms of

---

1946. . . . The television boom occurred between 1949, when 940,000 households had a set, and 1953, when the number soared to 20 million.").

[21] *Evolution of Periodicals*, at http://www.historychannel.com (last visited May 3, 2004).

[22] Plaintiff's argument is a syllogism. The major premise is that the Alabama Legislature could have included reporters for magazines or any other media source of news among those entitled to claim the statutory privilege if it had chosen to do so. *See* doc. no. 15 (plaintiff's brief in support of motion to compel), at 2. The minor premise is that the Legislature specifically limited the privilege to persons "engaged in, connected with or employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering capacity." The conclusion drawn by Coach Price from these premises is that Alabama Code § 12-21-142 does not apply to defendants.

[23] "For example, the rule that 'each citizen is entitled to vote' implies that noncitizens are not entitled to vote." *Black's Law Dictionary* 602 (7th ed. 1999).

-14-

the statute."); *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 188, 98 S. Ct. 2279, 2299, 57 L. Ed. 2d 117 (1978) (refusing to read additional exemptions into the Endangered Species Act).

This canon of construction has long been employed by Alabama courts. *See, e.g., Jefferson County v. Alabama Criminal Justice Information Center Commission*, 620 So. 2d 651, 658 (Ala. 1993) ("It is clear that if the legislature had intended to make local governments responsible for the financial needs of the ACJIC, it would have done so when it set out specific duties in the statute."); *City of Birmingham v. Brown*, 241 Ala. 203, 208, 2 So. 2d 305, 309 (Ala. 1941) ("As evidence of the legislature's intent . . . , it is significant to note that the legislature has expressly granted the right of condemnation in aid of some of the uses enumerated in section 2046, impliedly withholding the right in others: *Expressio unius est exclusio alterius*."); *Smith v. Alabama*, 660 So. 2d 1320, 1324 (Ala. Civ. App. 1995) (statute's specific enumeration of jurisdictional matters while omitting reference to filing fees "implies an intention to exclude other requirements not so included.").

The "fundamental rule of statutory construction" in Alabama, however, "is to ascertain and give effect to the intent of the Legislature in enacting a statute. . . . If possible, a court should gather the legislative intent from the language of the statute itself." *Jefferson County v. Acker*, No. 1010843, 2003 WL 22463396, at *4 (Ala. Oct.

31, 2003) (quoting *Norfolk Southern Ry. Co. v. Johnson*, 740 So. 2d 392, 396 (Ala.

1999) (in turn citing *IMED Corp. v. Systems Engineering Assocs. Corp.*, 602 So. 2d

344, 346 (Ala. 1992), and *Advertiser Co. v. Hobbie*, 474 So. 2d 93 (Ala. 1985)). This

is but another way of expressing the "plain meaning rule" of statutory construction:

*i.e.*,

> when the language of a statute is plain and does not lead, in the case
> before the court, to absurd or impracticable results, there is no occasion
> or excuse for judicial construction; the language must then be accepted
> by the courts as the sole evidence of the ultimate legislative intent, and
> the courts have no function but to apply and enforce the statute
> accordingly. Stated another way: when the language is plain and admits
> of no more than one meaning, the duty of interpretation does not arise
> and the rules which are to aid doubtful meaning need no discussion.

Edward F. Hennessey, *Judges Making Law* 28 (1994) (footnotes omitted).

The plain meaning rule is reinforced by yet another fundamental principle of

Alabama law: "statutes in derogation or modification of the common law are strictly

construed. . . . Such statutes are presumed not to alter the common law in any way

not expressly declared." *Ex Parte Key,* No. 1011682, 2003 WL 21480618, at *4 (Ala.

June 27, 2003) (refusing to hold that the common law "year-and-a-day rule" had been

abolished by the enactment of the Criminal Code) (citations and internal quotation

marks omitted). *See also*, *e.g.*, *Arnold v. State,* 353 So. 2d 524, 526 (Ala. 1977)

(strictly construing statute which allowed, but did not require, a husband and wife to

testify for or against each other in criminal cases, because statute was in derogation

of the common law rule that spouses were incompetent to testify against each other);

*Grant v. State Department of Human Resources,* 560 So. 2d 1050, 1052 (Ala. Civ.

App. 1990) (strictly construing statute which provided an exception to the common

law rule that hearsay is not admissible in evidence); *Sutherland v. Roth,* 407 So. 2d

139, 140 (Ala. Civ. App. 1981) (strictly construing statute which altered the common

law rule that parents are not automatically liable for their child's torts).

Alabama Code § 12-21-142 unquestionably is "in derogation of the common

law," insofar as it modifies the common law's refusal to recognize the existence of

any privilege authorizing a reporter to refuse to reveal confidential information

relevant to the issues of a legal proceeding.

Defendants contend, however, that construction of § 12-21-142 in accordance

with its plain and unambiguous language leads to absurd results.  The following

argument is illustrative of their position:

> Price would have this Court rule that the applicability of § 12-21-
> 142 turns solely on whether the information from the source is
> ultimately printed on newspaper.  Under Price's reasoning, a reporter for
> the *Cleburne News* could assert the privilege under § 12-21-142, but a
> reporter for *Newsweek* could not, even though both are published
> weekly, simply because *Newsweek* is printed on glossy paper.
> Apparently, Price would also deny internet-only news outlets (e.g.,
> Slate.com) and wire services (e.g., Reuters) the ability to assert the
> privilege in Alabama because neither is expressly listed in the statute.

No rational reason exists to conclude that the Alabama Legislature intended to discriminate among news-gathering outlets. . . .[24]

Defendants also contend that the definition of the statutory term "newspaper" is broad

enough to encompass a "magazine." They argue, for example, that

the term "magazine" is reasonably included in the definition of "newspaper" as contemplated in § 12-21-142. "Newspaper" is generally defined as "a paper that is printed and distributed daily, weekly, or at some other regular and usu[ally] short interval and that contains news, articles of opinion (as editorials), features, advertising, or other matter regarded as of current interest." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1524 (1993). The relevant definitions of "magazine" are "a periodical that usu[ally] contains a miscellaneous collection of articles, stories, poems, and pictures and is directed at a group having a particular hobby, interest, or profession (as education, photography, or medicine) or at a particular age group (as children, teen-agers) . . . ." Id. at 1357-58. The similarity in definitions is no doubt the reason that "magazine" is a recognized synonym of "newspaper." See, e.g., WEBSTER'S COLLEGIATE THESAURUS 505 (1988) (indicating that "magazine, organal, periodical, [and] review" are synonyms of newspaper); ROGET'S 21ST CENTURY THESAURUS IN DICTIONARY FORM 573 (1992) (defining newspaper as a "regular, continuous publication containing information" and indicating  that "biweekly, bulldog, community, daily, extra, gazette, journal, magazine, metropolitan, organ, paper, periodical, press, rag, record, review, scandal sheet, sheet, tabloid, trade, [and] weekly" are synonyms of newspaper).  Thus, because "magazine" is reasonably included in the definition of "newspaper" as contemplated in § 12-21-142, a magazine and its reporters may assert the privilege provided news-gathering persons therein.[25]

---

[24] Doc. no. 14 (defendants' response to plaintiff's motion to compel), at 7 (footnotes omitted).

[25] Id. at 3-4.  Defendants additionally contend that the heading to Ala. Code § 12-21-142, which they incorrectly refer to as its "title" (i.e., "Exemption of newsgathering persons from disclosing sources"), "indicates that the Alabama Legislature recognized the importance of all newsgathering outlets and intended that the privilege be equally available to all." Id. at 4.  This

-18-

This court is not persuaded by that argument. The contention that a "magazine," particularly one such as *Sports Illustrated*, which is "directed at a group having a particular . . . interest,"[26] should be considered a synonym for "newspaper" strains the commonly understood meanings of those words.[27]

Defendants' semantical argument also is undercut by the fact that the Alabama Legislature often has acknowledged a distinction between the terms "newspaper" and "magazine" by enacting statutory provisions in which both words appear. Twenty such instances are listed in the Appendix to this opinion.

---

argument is without merit. It ignores the Code Commissioner's interpretive guidance:

> (a) The classification and organization of the titles, chapters, articles, divisions, subdivisions and sections of this Code, *and the headings thereto*, are made for the purpose of convenient reference and orderly arrangement, *and no implication, inference or presumption of a legislative construction shall be drawn therefrom.*

> (b) Unless otherwise provided in this Code, *the descriptive headings or catchlines immediately preceding or within the text of the individual sections of this Code*, except the section numbers included in the headings or catchlines immediately preceding the text of such sections, *do not constitute part of the law, and shall in no manner limit or expand the construction of any such section.* All historical citations and notes set out in this Code are given for the purpose of convenient reference, and do not constitute part of the law.

Ala. Code § 1-1-14 (1975) (1999 Replacement Vol.) (emphasis supplied). Moreover, the preamble to the 1949 amendatory statute stated its purpose in the following manner: "To Amend Section 370, Title 7, of the Alabama Code of 1940, the Section commonly referred to as 'The Newspaper Privilege' Law." Act of Aug. 9, 1949, No. 376, § 1, 1949 Ala. Acts 548 (now codified at Ala. Code § 12-21-142 (1975) (1995 Replacement Vol.))

[26] *Webster's Third New International Dictionary* 1357-58 (2002) (defining "magazine").

[27] *See id.* at 1524 (including an entry for "newsmagazine," as distinguished from "newspaper," and defining the former noun as meaning "a periodical typically published weekly and devoted chiefly to summarizing and analyzing current news").

In like manner, the legislatures of some states that have enacted statutes shielding a reporter's sources of information from compelled disclosure have clearly indicated whether the privilege extends to *magazine* reporters, as opposed to reporters for other forms of print or electronic news media. For example, Montana's statute provides:

> Without his or its consent, no person, including any newspaper, *magazine*, press association, news agency, news service, radio station, television station, or community antenna television service or any person connected with or employed by any of these for the purpose of gathering, writing, editing, or disseminating news may be examined as to or may be required to disclose any information obtained or prepared or the source of that information in any legal proceeding if the information was gathered, received, or processed in the course of his employment or its business.

Mont. Code Ann. § 26-1-902(1) (WESTLAW through 2003 Sess.) (emphasis supplied).

Likewise, Pennsylvania's shield law, which is similar to the Alabama statute, reads as follows:

> No person engaged on, connected with, or employed by any newspaper of general circulation or any press association or any radio or television station, *or any magazine of general circulation*, for the purpose of gathering, procuring, compiling, editing or publishing news, shall be required to disclose the source of any information procured or obtained by such person, in any legal proceeding, trial or investigation before any government unit.

42 Pa. Const. Stat. Ann. § 5942 (West, WESTLAW current through Act 2004-21) (emphasis supplied).[28]

Other states have taken the course of extending the privilege to "any medium of communication to the public." New Mexico's reporter's privilege provision, for example, provides that: "Unless disclosure be essential to prevent injustice, no journalist or newscaster, or working associates of a journalist or newscaster, shall be required to disclose before any proceeding or authority . . . the source of any published or unpublished information for *any medium of communication to the public*." N.M. Stat. Ann. § 38-6-7(A) (WESTLAW current through the Special Session of the 46th Legislature (2004)) (emphasis supplied). Moreover, the phrase "medium of communication" is statutorily defined as "any newspaper, *magazine*, press association, news service, wire service, news or feature syndicate, broadcast or television station or network, or cable television system." *Id.* at § 38-6-7(B)(2) (emphasis supplied).

In like manner, Oklahoma's privilege statute exempts journalists from

---

[28] Additionally, Nevada's statutory privilege extends to "reporter[s], former reporter[s] or editorial employee[s] of any newspaper, *periodical* or press association or employee of any radio or television station." Nev. Rev. Stat. 49.275 (West, WESTLAW current through 2003 Regular Sess.) (emphasis supplied). Rhode Island's statute likewise includes the term "periodical." R.I. Gen. Laws § 9-19.1-2 (WESTLAW through Jan. 2003 Sess.) ("[N]o person shall be required . . . to disclose the source of any confidential information received . . . in his or her capacity as a reporter, . . . journalist, writer, . . . or other person directly engaged in the gathering or presentation of news for any accredited newspaper, *periodical*, press association, newspaper syndicate, wire service, or radio or television station.") (emphasis supplied).

disclosing a source of information "obtained in the gathering, receiving or processing of information for *any medium of communication to the public*." Okla. Stat. Ann. § 2506(B) (West, WESTLAW current through 2004 Sess.) (emphasis supplied).[29] Again, the Oklahoma legislature defined the phrase "medium of communication" as including "any newspaper, *magazine*, other periodical, book, pamphlet, news service, wire service, news or feature syndicate, broadcast station or network, cable television system, or record." *Id.* at § 2506(A)(2) (emphasis supplied).

This court is aware of no Alabama state court decisions construing the scope of Alabama Code § 12-21-142, as it presently is written. Another judge of this court addressed the *original* statutory language, however, in the context of a collateral controversy that grew out of a civil action pending in the United States District Court for the Southern District of New York. *Ex parte Sparrow*, 14 F.R.D. 351 (N.D. Ala. 1953). The action had been filed by former Alabama Governor James E. Folsom against Dell Publishing Company for allegedly libelous statements contained in an article published in defendant's magazine, *Front Page Detective*, under the title "Devil's Island, U.S.A." "The general theme of [the] article related to conditions existing in state prisons during plaintiff's tenure of office as Governor of the State of

---

[29] Significantly, § 2506(B) also provides: "This subsection does not apply with respect to the content or source of *allegedly defamatory information, in a civil action for defamation wherein the defendant asserts a defense based on the content or source of such information.*" Okla. Stat. Ann. § 2506(B) (West, WESTLAW current through 2004 Sess.) (emphasis supplied).

Alabama." *Id.* at 352. During preparation for trial it was learned that Hugh Sparrow — a veteran newspaper reporter who had written a series of articles on the same subject for *The Birmingham News* — had furnished the author of the magazine article at least some of the information upon which the allegedly libelous statements were based. Governor Folsom's attorneys consequently sought to depose Mr. Sparrow in Birmingham, Alabama.

"During the course of plaintiff's examination of the witness, he refused to answer certain questions propounded to him by plaintiff's counsel, raising the claim of privilege against disclosure of his sources of information under an Alabama statute," *i.e.*, Alabama Code Title 7, § 370 (1940). *Ex parte Sparrow*, 14 F.R.D. at 352 (footnote omitted).[30] The assertion of privilege was based upon the fact that, during "the process of collecting data which formed the factual basis for *his*

---

[30] In the omitted footnote, the *Sparrow* court quoted the language of the original statute, as enacted by the Alabama Legislature during 1935:

> Newspaper employees.— No person engaged in, connected with or employed on any newspaper while engaged in a news gathering capacity shall be compelled to disclose, in any legal proceeding or trial, before any court or before a grand jury of any court, or before the presiding officer of any tribunal or his agent or agents, or before any committee of the legislature, or elsewhere, the source of any information procured or obtained by him and published in the newspaper on which he is engaged, connected with or employed.

*Ex parte Sparrow*, 14 F.R.D. 351, 353 n.1 (N.D. Ala. 1953) (quoting Act of Aug. 21, 1935, No. 253, § 2, 1935 Ala. Acts 649, codified at Ala. Code Tit. 7, § 370 (1940)). The opinion does not explain why the court quoted the original, 1935 statutory language, instead of the text of the 1949 amendment.

[*Birmingham News*] *articles*, [Sparrow had] received numerous reports given to him in confidence by employees of the State departments involved in his investigation." *Id.* (emphasis added).

Governor Folsom then instituted an ancillary proceeding in this court, to compel Sparrow to answer "the questions against which the claim of privilege had been interposed, as contemplated by the provisions of rule 37(a)." *Id.*[31]  Judge Seybourn Lynne denied the motion, and sustained Sparrow's claim of privilege, saying:

> It is conceded that the sources of information given to a journalist are not privileged under the law of New York and that if Sparrow were to appear as a witness there, he could and would be compelled to disclose his sources of information.
>
> But rule 26, under which his examination was being conducted, provides that "* * * the deponent may be examined regarding any matter, *not privileged*, which is relevant to the subject matter involved in the pending action * * *."[32]  For the purpose of determining the witness' claim of privilege, this court, by rule 37, is constituted the forum or the place where plaintiff, the proponent, is required to pursue his remedy to compel the witness to answer.
>
> While this court does not consider the question of privilege to be a matter of substance and therefore controlled by *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188, it would appear that this court should refer to the statutory law of Alabama in the

---

[31] The pertinent language of the present rule provides that "[a]n application for an order to a person who is not a party shall be made to the court in the district where the discovery is being made, or is to be, taken [sic]." Fed. R. Civ. P. 37(a)(1).

[32] The same principle now is found in Federal Rules of Civil Procedure 26(b)(1) and (b)(5).

absence of any Federal rule on privilege.

No Federal case has been called to my attention; I have found none, dealing with the claim of privilege by a journalist with respect to the sources of his information. The Alabama statute clearly privileges such sources of information. At least eleven other states have passed similar statutes.

This court is not bound to apply the Alabama law in interpreting the words "not privileged" as they appear in rule 26(b).[33] But it would not be justified in ignoring such a clear and unequivocal pronouncement of the public policy of the state in which it sits, merely to reach out and apply a rule against the asserted privilege established in a non-federal jurisdiction.

It is not a matter of judicial concern that the Legislature of Alabama was either prudent or unwise in clothing the sources of a journalist's information with secrecy. So far as this court is concerned, the public policy of the State of Alabama in this regard was crystallized by enactment of the statute involved. There is no merit in plaintiff's contention that such statute is unconstitutional when measured by the test of the Fourteenth Amendment to the Constitution of the United States.

It follows that Sparrow's claim of privilege is upheld and that the motion of proponent, the plaintiff, James E. Folsom, to compel such witness to answer the questions referred to is denied.

*Id.* at 353 (emphasis in original) (footnotes omitted).

Upon first reading the *Sparrow* opinion, it might appear that the decision, pertaining as it did to the confidential sources of allegedly libelous statements

---

[33] This statement may have been accurate at the time the *Sparrow* opinion was rendered, but in light of the adoption of the Federal Rules of Evidence, particularly Fed. R. Evid. 501, it no longer is sound.

published in a national *magazine*, provides the rule for deciding the issue presently confronting the court.  A closer reading establishes otherwise, however, because "Sparrow, during the course of his examination, refused to answer *only* those questions which would have required disclosure of the source of information procured or obtained by him *and published in the newspaper on which he was employed.*" *Id.* at 352 (emphasis supplied).  Stated differently, the text of the opinion clearly implies that Sparrow did not contend that Alabama's statutory privilege applied to questions which required him to disclose any source of information for statements that were *not* published in the *Birmingham News*, but instead appeared for the first time in the *Front Page Detective* magazine article.  *See* Joseph A. Colquitt, *Alabama Law of Evidence* § 5.6, at 173 (1990).

In any event, the duty of this court is to interpret and enforce the intention of the enacting legislature, and "[i]t is not a matter of judicial concern that the Legislature of Alabama was either prudent or unwise" in limiting the statutory privilege to only those persons "engaged in, connected with or employed on any newspaper, radio broadcasting station or television station." *Ex parte Sparrow*, 14 F.R.D. at 353.  Instead, "[s]o far as this court is concerned, the public policy of the State of Alabama in this regard was crystallized by enactment of the statute involved," *id.*, and any deviation therefrom lies within the province of the Alabama

Legislature.  As the Supreme Court of Alabama has observed:

> [t]he State of Alabama does not preserve committee reports, or the debates that surround the adoption of legislation; so, we are unable to review the legislative history of [a] statute, but "[w]hen [a] statutory pronouncement is clear and not susceptible to a different interpretation, *it is the paramount judicial duty of a court to abide by that clear pronouncement.*"

*Macon v. Huntsville Utilities,* 613 So. 2d 318, 320 (Ala. 1992) (quoting *Parker v. Hilliard,* 567 So. 2d 1343, 1346 (Ala. 1990) (emphasis supplied)).

For all of the foregoing reasons, this court concludes that Alabama Code § 12-21-142 applies *only* to those reporters who are "employed on any newspaper, radio broadcasting station or television station, while engaged in a news-gathering capacity," and does not shield defendants from plaintiff's attempts to discover their confidential sources.

## B.   The Constitutionality of Alabama Code § 12-21-142

The plain meaning of the Alabama statute implicates First Amendment and Fourteenth Amendment Equal Protection concerns[34] as a result of its disparate treatment of newspaper, radio, and television reporters, on the one hand, and reporters for other forms of communication to the public on the other.  It is well settled that

---

[34] It should be noted that the Supreme Court of Alabama has determined that the Alabama Constitution of 1901 does not guarantee equal protection. *See Ex parte Melof,* 735 So. 2d 1172, 1186 (Ala. 1999) ("[W]e now restate what the Justices of this Court correctly declared in 1949, that 'there is no equal protection clause in the Constitution of 1901.'") (quoting *Opinion of the Justices No. 102,* 252 Ala. 527, 530, 41 So. 2d 775, 777 (Ala. 1949)).

"[t]he press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S. Ct. 666, 669, 82 L. Ed. 949 (1938).  Moreover, "[f]reedom of speech and freedom of the press . . . are among the fundamental personal rights and liberties which are protected" from infringement by state action. *Id.* at 450, 58 S. Ct. at 668. For such reasons, one commentator opined that

> [i]t is particularly unlikely that denying [a statutory reporter's] privilege to *periodicals*, while extending it to *other print media*, could survive an equal protection or first amendment challenge. In the context of the California libel law for recovery of special damages, which extends greater protection to newspapers than magazines, such a classification has been upheld on the ground that newspapers must operate with greater speed, and therefore have less opportunity to verify accuracy.  This distinction would not, however, apply to shield laws *since their purpose is to encourage the flow of news to the public, and there is no valid distinction between newspapers and periodicals or magazines for purposes of the shield law.  Any medium of communication that is disseminated generally to the public should thus be treated equally.*

Carl C. Monk, *Evidentiary Privilege for Journalists' Sources*: *Theory and Statutory Protection*, 51 Mo. L. Rev. 1, 34 (1986) (footnotes omitted) (emphasis supplied). Thus, the disparate classification of newspaper and magazine reporters for purposes of the statutory privilege arguably violates a fundamental right, and may be justified only by a showing of a compelling state interest.

Even so, this court cannot cure any constitutional infirmity from which the

-28-

statute may suffer by, as defendants urge, holding that the term "newspaper"

employed in Alabama Code § 12-21-142 encompasses "magazines."

> Any attempt by [a court] to "clarify" [a] statute actually adds confusion
> and uncertainty to the meaning of the statute. If the Legislature
> considers the statute in need of adjustment, it is free to make that
> adjustment. However, it is not the duty of [the courts] to "correct"
> statutes enacted by the Legislature.

*American National Red Cross v. ASD Specialty Healthcare, Inc.*, No. 1020446, 2004

WL 541821, at *5 (Ala. Mar. 19, 2004) (overruling application for rehearing)

(Houston, J., dissenting).

Further, because the court already has determined that the statutory privilege

does not apply to magazine reporters, a determination as to the constitutionality of the

statute is unnecessary to resolution of the issue presented here. *See* 16 Am. Jur. 2d

*Constitutional Law* § 117 ("The invariable practice of the courts is not to consider the

constitutionality of legislation unless it is imperatively required, essential to the

disposition of the case, and unavoidable. Thus, a court will inquire into the

constitutionality of a statute only when and to the extent that a case before it requires

entry upon that duty, and only to the extent that it is essential to the protection of the

rights of the parties concerned.") (footnotes omitted).

This conclusion does not end the discussion, however. Instead, the court must

evaluate whether the so-called "qualified reporter's privilege" emanating from the

First Amendment protects defendants from compelled disclosure of their sources.

## C.     The "Qualified Reporter's Privilege"

Discussion must begin with *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646,

33 L. Ed. 2d 626 (1972), in which the Supreme Court addressed the question of

whether the requirement that reporters "appear and testify before state or federal

*grand juries* abridges the freedom of speech and press guaranteed by the First

Amendment." *Id.* at 667, 92 S. Ct. at 2649-50 (emphasis supplied).  The Court

declined to create an absolute testimonial privilege applicable only to reporters,

holding that the grand jury's "important [and] constitutionally mandated role" in the

government's fundamental function of "[f]air and effective law enforcement aimed

at providing security for the person and property of the individual" outweighed

reporters' concerns that the flow of news would be diminished by compelled

testimony. *Id.* at 690, 693, 92 S. Ct. at 2660, 2662-63.  The Court's holding was

limited to the following circumstances:  "Grand juries address themselves to the

issues of whether crimes have been committed and who committed them. Only where

news sources themselves are implicated in crime or possess information relevant to

the grand jury's task need they or the reporter be concerned about grand jury

subpoenas." *Id.* at 691, 92 S. Ct. at 2661.  In a concurring opinion, Justice Powell

confirmed that the Court's holding was limited in scope:  "The Court does not hold

that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources." *Id.* at 709, 92 S. Ct. at 2671.

Following *Branzburg*, courts have recognized a *qualified* reporter's privilege under the First Amendment in various circumstances, the contours of which were described by another court within this Circuit in the following manner:

> In criminal cases, federal courts have generally balanced the competing interests in favor of disclosure. *See, e.g., Baker v. F & F Investment*, 470 F.2d 778 (2d Cir. 1972); *Loadholtz v. Fields*, 389 F. Supp. 1299 (M.D. Fla. 1975). In civil cases, "courts must recognize that the public interest in nondisclosure of journalist's news sources will often be weightier than the private interest in compelled disclosure." *Baker v. F & F Investment Co.*, 470 F.2d 778, 785 (2d Cir. 1972).
>
> Federal courts have held generally that the qualified privilege does not apply when the reporter is being questioned about an incident to which he or she may be a witness like any other member of the public. *See, e.g., Miller v. Mecklenburg County*, 602 F. Supp. 675 (W.D.N.C. 1985); *Alexander v. Chicago Park Dist.*, 548 F. Supp. 277 (N.D. Ill. 1982). In such a case, there is no intrusion into newsgathering or the special functions of the press. *Miller*, 602 F. Supp. at 679.
>
> Federal courts have also examined the type of disclosure requested in balancing the competing interests of a free press and a fair trial. Generally, the more confidential the information sought, the greater the First Amendment protection. *Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597, 224 Ct. Cl. 583 (1st Cir. 1980); *Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979). Thus, if information was given to a reporter on a promise of confidentiality, a court would be more reluctant to compel a betrayal of such a confidence. Such betrayal would tend to prevent the reporter from obtaining

-31-

information later which he could then pass on to the public. Consequently, the public has a heightened interest where disclosure of confidential information is sought. *Compare Miller v. Mecklenburg County*, 602 F. Supp. 675 (W.D.N.C. 1985) *with Miller v. Mecklenburg County*, 606 F. Supp. 488 (W.D.N.C. 1985).

Federal courts have also developed an analytical framework for determining whether a reporter is privileged from discovery. In order to invoke the privilege the newspaper reporter must show that he received the information in dispute while engaged in a newsgathering capacity. *Von Bulow by Auersperg v. Von Bulow*, 811 F.2d 136 (2d Cir. 1987). *Once the reporter makes this showing, the party seeking disclosure must meet a three part test in order to compel discovery: (1) the information sought must be relevant, (2) the information sought must not be obtainable by alternative means, and (3) there must be a compelling need for the information. Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980).

*Pinkard v. Johnson*, 118 F.R.D. 517, 520-21 (M.D. Ala. 1987) (emphasis supplied) (footnote omitted).[35]

The former Fifth Circuit's binding decision in *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980),[36] observed that "[t]he First Amendment interest in granting a privilege is particularly strong when the article concerns a public figure." *Id.* The Court also noted that

[a] final First Amendment consideration, in a case involving a

---

[35] The omitted footnote acknowledged that Alabama Code § 12-21-142 expressed "Alabama's policy of giving protection to confidential 'sources of information' obtained by reporters." 118 F.R.D. at 521 n.3.

[36] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

> public figure, is that it will often be possible to establish malice or lack
> of malice without disclosure of the identity of the informant. A plaintiff
> may be able to find other evidence of malice, or a defendant may be able
> to come forward with sufficient evidence of prudence in printing which
> would carry the burden in support of a motion for summary judgment.

*Id.*

In *Miller*, a high-ranking official of the International Brotherhood of Teamsters sued Transamerican Press for libel based upon statements in an article appearing in one of its publications. The article, entitled "Central States Pension Fund — How Your Sweat Finances Crooks' Cadillacs," alleged that Miller had bilked the pension fund out of $1.6 million through a fraudulent loan. *Id.* at 723. In the course of discovery, Miller learned that the source of the information contained in the article was a confidential informant. Miller moved to compel disclosure of the identity of the source, but his motions were denied by the district court because Miller had not shown that he exhausted alternative means of proving that Transamerican was reckless to publish the allegations. *Id.* Miller then submitted written interrogatories to a pension fund trustee, who stated that, to his knowledge, Miller had not borrowed money from the pension fund. Based on the foregoing, Miller again moved to compel disclosure of the source's identity. The district judge granted the motion, finding that the identity of the informant went to the heart of the matter, and certified the order for interlocutory appeal. *Id.*

The former Fifth Circuit held that Miller was a public figure by virtue of his position as a "high-ranking official of a union of tremendous importance to [the] economy"; accordingly, he was required to prove that Transamerican acted with actual malice when it published the article. *Id.* at 724. The Court observed that the case was controlled by *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967), *Branzburg, supra,* and *Herbert v. Lando*, 441 U.S. 153, 99 S. Ct. 1635, 60 L. Ed. 2d 115 (1979), and held that "a reporter has a First Amendment privilege which protects the refusal to disclose the identity of confidential informants[;] however, the privilege is not absolute and in a libel case as is here presented, the privilege must yield." *Miller*, 621 F.2d at 725.

The Court further observed that all circuit decisions that previously had analyzed the issue predated the Supreme Court's decision in *Herbert*, which held that "the press had no First Amendment privilege against discovery of mental processes where the discovery was for the purpose of determining whether malice existed." *Id.* Even so, the former Fifth Circuit adopted the three-part test established in *Garland v. Torre*, 259 F.2d 545 (2d Cir. 1958), and employed by the other circuits that had considered the issue — *i.e.*, "(1) is the information relevant, (2) can the information be obtained by alternative means, and (3) is there a compelling interest in the

information?"[37] *Miller*, 621 F.2d at 726. The Court determined that the information

sought was relevant, and held that the district court's finding that the information

could not be obtained by alternative means was not clearly erroneous.

In order to evaluate whether the plaintiff in *Miller* had established "a

compelling interest in the information," the former Fifth Circuit surveyed the

decisions of the other Circuits that had addressed this issue in the following manner:

> In *Cervantes* [*v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972)], the
> Eighth Circuit found no compelling interest when the mayor of St. Louis
> complained of four paragraphs in an 87 paragraph story. There was
> ample evidence showing that a thorough investigation preceded
> publication. The court said:
>
>> [I]f, in the course of pretrial discovery, an allegedly libeled
>> plaintiff uncovers substantial evidence tending to show that the
>> defendant's published assertions are so inherently improbable that

---

[37] *See Carey v. Hume*, 492 F.2d 631 (D.C. Cir. 1974); *Cervantes v. Time, Inc.*, 464 F.2d 986 (8th Cir. 1972). On petition for rehearing and petition for rehearing en banc, the Fifth Circuit supplemented its opinion with the following language:

We do not mean to intimate that a plaintiff will be entitled to know the identity of the informant merely by pleading that he was injured by an untrue statement. Before receipt of such information the plaintiff must show:  substantial evidence that the challenged statement was published and is both factually untrue and defamatory; that reasonable efforts to discover the information from alternative sources have been made and that no other reasonable source is available; and that knowledge of the identity of the informant is necessary to proper preparation and presentation of the case. From our review of the record, we are satisfied that all of these requirements have been met.

*Miller v. Transamerican Press, Inc.*, 628 F.2d 932, 932 (5th Cir. 1980). The foregoing statement did not supplant the three-part test; rather, the court merely reiterated its holding that a plaintiff's contention that the qualified "reporter's privilege" should be pierced must have evidentiary support.

there are strong reasons to doubt the veracity of the defense informant or the accuracy of his reports, the reasons favoring compulsory disclosure . . . become more compelling. Similarly, where pretrial discovery produces some factor which would support the conclusion that the defendant in fact entertained serious doubt as to the truth of the matters published, identification and examination of defense news sources seemingly would be in order, and traditional summary judgment doctrine would command pursuit of further discovery prior to adjudication of a summary judgment motion. . . .

464 F.2d at 994.

In *Carey* [*v. Hume*, 492 F.2d 631 (D.C. Cir. 1974)], the D.C. Circuit found a compelling interest in disclosure. The record did not disclose a thorough investigative effort by the defendant. The plaintiff, a high official of the United Mine Workers, was accused of thwarting a government investigation by removing boxes of incriminating documents from his office at night over an indefinite period of weeks. The only evidence within the plaintiff's control that could disprove the story was his own testimony. Since the story was based solely on information from a confidential source, the only way to determine recklessness was to examine the reliability of the informant.

*Garland* [*v. Torre*, 259 F.2d 545 (2d Cir. 1958)] was similar to *Carey*. Judy Garland claimed she was defamed in a newspaper article that quoted an unnamed CBS executive. She sued CBS and deposed the two executives who supposedly had made the defamatory statement. Both denied having made it. Garland subpoenaed the reporter to determine the source of her information. The reporter's claim of privilege was overridden. The information was obviously relevant and there was no other proof reasonably available to Miss Garland.

*Miller*, 621 F.2d at 726. Based upon the foregoing analysis, the *Miller* Court affirmed the district court's order compelling Transamerican to disclose the identity of its

-36-

confidential source.

> Miller's case is more akin to *Garland* and *Carey* than it is to *Cervantes*. Unlike the mayor in *Cervantes*, Miller challenges every statement that refers to him and that could be interpreted as defamatory. Like the defendants in *Carey* and *Garland*, Transamerican's only source for the allegedly libelous comments is the informant. The only way that Miller can establish malice and prove his case is to show that Transamerican knew the story was false or that it was reckless to rely on the informant. *In order to do that, he must know the informant's identity.*

*Id.* at 727 (emphasis added).

### 1.    Application of the *Miller* test

Turning to the application of the *Miller* test, the first inquiry is whether the information sought is relevant.

"To establish a prima facie case of defamation, the plaintiff must show that the defendant published a false and defamatory statement concerning the plaintiff to a third person." *Atkins Ford Sales, Inc. v. Royster*, 560 So. 2d 197, 200 (Ala. 2003).

In *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), the Supreme Court held that where a plaintiff is a public *official*, proof of actual malice is required before damages may be awarded. *Id.* at 283, 84 S. Ct. at 727.

In *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989), the Supreme Court unequivocally confirmed that

the *New York Times* "actual malice" standard applicable to public *officials* also

applies to public *figures*. *Id.* at 666, 109 S. Ct. at 2685. The Court explained that

> in [*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094, 1111 (1967)], Justice Harlan had opined that the *New York Times* actual malice standard should be reserved for cases brought by public officials. The *New York Times* decision, in his view, was primarily driven by the repugnance of seditious libel and a concern that public official libel "lay close" to this universally renounced, and long-defunct, doctrine. In place of the actual malice standard, Justice Harlan suggested that a public figure need only make "a showing of highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers."  This proposed standard, however, was emphatically rejected by a majority of the Court in favor of the stricter *New York Times* actual malice rule. Moreover, just four years later, Justice Harlan acquiesced in application of the actual malice standard in public figure cases, see *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 69-70 (1971) (dissenting opinion), and by the time of the Court's decision in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), the Court was apparently unanimously of this view. Today, there is no question that public figure libel cases are controlled by the *New York Times* standard and not by the professional standards rule, which never commanded a majority of this Court.

*Harte-Hanks Communications*, 491 U.S. at 665-66, 109 S. Ct. at 2685.

It is uncontested that Coach Price is a public figure. Accordingly, and in sum,

he is

> required to prove by clear and convincing evidence that the defendants acted with actual malice as defined in *New York Times v. Sullivan*, 376 U.S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 155, 87 S. Ct. 1975, 1991, 18 L.Ed.2d 1094, 1111 (1967).  A publisher acts with actual malice

> when he prints a story with knowledge that it is false or with reckless disregard for the truth. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S. Ct. 2997, 3008, 41 L.Ed.2d 789, 806 (1974); *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S. Ct. 1323, 1325, 20 L.Ed.2d 262, 267 (1968).

*Long v. Arcell*, 618 F.2d 1145, 1147 (5th Cir. 1980).

Plaintiff thus must establish that the statements contained in the *Sports Illustrated* article were false, and that defendants published those statements either with knowledge of their falsity, or in reckless disregard for the truth. Accordingly, the identity of the undisclosed sources is unquestionably relevant to a determination of the truth or falsity of statements attributed to those sources by defendants.

Moreover, plaintiff has submitted evidence that the article contained statements that are factually untrue and defamatory. Specifically, Coach Price has submitted the transcript of a telephone conversation with defendant which occurred prior to publication of the *Sports Illustrated* article, and during which Yaeger asked Coach Price to comment on the hotel room incident that ultimately was reported in the article. The transcript reflects that Coach Price categorically, and repeatedly, denied that the incident occurred, stating at one point "[t]hat story you heard there is completely false."[38]

Plaintiff must next show that the information he seeks is not obtainable by

---

[38] Doc. no. 15 (Plaintiff's Brief in Support of Motion to Compel), ex. 2, at unnumbered page 2.

alternative means. In that regard, the following exchange occurred during defendant

Don Yaeger's deposition:

> Q. So to make sure I understand your answer earlier, the confidential source who provided you with information about what occurred in the room with Coach Price had direct firsthand knowledge by being either an eyewitness or a participant?
>
> A. That is correct.
>
> Q. How many confidential sources did you have for the room?
>
> A. One.[39]

Later during the deposition, Yaeger was questioned as follows:

> Q. Mr. Yaeger, do you believe there were two women in Coach Price's room at the Crown Plaza?
>
> A. I do, sir.
>
> Q. You believe it strongly?
>
> . . . .
>
> A. I'm satisfied it's the truth.
>
> Q. You spoke to one of those women who is a confidential source?
>
> A. Correct.[40]

Moreover, the excerpts of Yaeger's deposition testimony submitted by plaintiff

---

[39] *Id.*, ex. 2, at deposition pages 286, 486-87.

[40] *Id.* at deposition page 324.

in support of the motion to compel are replete with his attorney's fruitless efforts, apparently based upon plaintiff's own investigation, to ascertain the identity of the confidential source. The court finds that plaintiff has sufficiently demonstrated the absence of alternative means to obtain the identity of defendants' confidential source.

Defendant Yaeger contends that there were two women in the hotel room — his confidential source and, possibly, a woman named Tracy Bragalia, whose identity he learned only after publication of his article, and to whom he never spoke.[41] Even if plaintiff were able to guess the identity of the confidential source, through a process of elimination or otherwise, nothing requires defendants to confirm that plaintiff's guess is correct. As in *Miller*, "[t]he only way [plaintiff] can establish malice and prove his case is to show that [defendants] knew the story was false or that it was reckless to rely on the informant. *In order to do that, he must know the informant's identity*." 621 F.2d at 726-27 (emphasis supplied).

For the same reasons, the court also finds that plaintiff has established "a compelling interest in the information." Further, at this point in the proceedings, the court cannot conclude from the limited evidence of record that defendants engaged in a thorough investigation of the events forming the basis of the article published in *Sports Illustrated*. Where, as here, the identity of the source is central to the

---

[41]Excerpts of deposition of Don Yaeger, appended to doc. no. 17 (Plaintiff's Supplemental Submission in Support of Motion to Compel), at deposition page 280.

plaintiff's proof in a libel action — *i.e.*, where the information sought "goes to the heart of the matter" — courts have compelled disclosure. *See Zerilli v. Smith*, 656 F.2d 705, 713 (D.C. Cir. 1981); *Miller,* 621 F.2d at 726-27; *Carey v. Hume*, 492 F.2d 631, 636 (D.C. Cir. 1974); *Garland*, 259 F.2d 545, 550 (2d Cir. 1958).

"Evidentiary privileges in litigation are not favored, and even those rooted in the Constitution must give way in proper circumstances." *Herbert v. Lando*, 441 U.S. 153, 175, 99 S. Ct. 1635, 1648, 60 L. Ed. 2d 115 (1979) (footnote omitted). The court concludes that those circumstances are present here, and, accordingly, plaintiff's motion to compel is due to be granted.[42]

## IV. DEFENDANTS' RENEWED MOTION FOR CERTIFICATION OF INTERLOCUTORY APPEAL

The applicable provision of the statute governing interlocutory appeals reads as follows:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a *controlling question of law as to which there is substantial ground for difference of opinion* and that *an immediate appeal from the order may materially advance the ultimate termination of the litigation,* he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may

---

[42]Plaintiff also sought disclosure of any notes that Yaeger took during conversations with the unnamed source. Yaeger stated during his deposition that such notes existed, but that he "shipped all [his] notes to New York." *Id.* at deposition page 351. During oral argument conducted on November 19, 2003, however, defendants' counsel advised plaintiff's counsel and the court that no such notes had been located.

thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b) (emphasis supplied).

Here, the question of whether defendants should be compelled to disclose their confidential sources for allegedly defamatory statements is a significant issue. Further, in view of the refusal of the Supreme Court of Alabama to answer the question certified by this court, there is substantial ground for difference of opinion. Moreover, if the court were to deny the motion for certification of interlocutory appeal, defendants effectively would be denied appellate review of this issue, as the identity of the source would be disclosed during trial. Finally, the court is convinced that an immediate appeal will materially advance the termination of this litigation.

## V. CONCLUSION

For all of the foregoing reasons, plaintiff's motion to compel is due to be granted, and, defendants' renewed motion for certification of interlocutory appeal also is due to be granted. A separate order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE this ___5th___ day of May, 2004.

C. Lynwood Smith, Jr.
United States District Judge

# APPENDIX

## Statutory Provisions in Which Alabama Legislature Acknowledged Distinctions Between the Terms "Newspaper" and "Magazine" (*i.e.*, Both Words Appear)

- Ala. Code § 8-6-2(18)(e) (1975) (2002 Replacement Vol.) ("'Investment adviser' does not include. . . [a] publisher, employee, or columnist of a *newspaper*, *news magazine*, or business or financial publication, or an owner, operator, producer, or employee of a cable, radio or television network, station, or production facility . . . .") (emphasis supplied);

- Ala. Code § 8-19A-4(6) (1975) (2002 Replacement Vol.) ("The provisions of this chapter do not apply to: . . . [a] person primarily soliciting the sale of a *newspaper*, periodical of general circulation, or *magazine*.") (emphasis supplied);

- Ala. Code § 11-65-20(i)(v) (1975) (1994 Replacement Vol.) ("The advertising prohibited in the protected territory . . . shall include . . . any advertising carried by *newspaper*, *magazines* or other publications published at any location in the protected territory; . . . with respect to *newspapers*, *magazines* and other publications, whether published at a location in or outside the protected territory . . . with respect to *newspapers*, *magazines* and other publications that are not published at a location in the protected territory . . . .") (emphasis supplied);

- Ala. Code § 13A-8-150 (2) (1975) (1994 Replacement Vol.) (2002 Supp.) ("Definitions. . . . Publish. The communication or dissemination of information to any one or more persons, either orally in person, or by telephone, computer network, radio, television, or in a writing of any kind, including, without limitation, a letter or memorandum, circular, handbill, *newspaper*, *magazine* article, or book.") (emphasis supplied);

- Ala. Code § 13A-9-44 (1975) (1994 Replacement Vol.) ("A television or radio broadcasting station, or a publisher or printer of a *newspaper*, *magazine* or other form of printed advertising, which broadcasts, publishes or prints a false advertisement or a bait advertisement . . . does not commit a crime . . . .")

(emphasis supplied);

- Ala. Code § 13A-12-28(b) (1975) (1994 Replacement Vol.) ("In any prosecution under this article in which it is necessary to prove the occurrence of a sporting event, (1) a published report of its occurrence in any daily *newspaper*, *magazine* or other periodically printed publication of general circulation . . . shall be admissible in evidence and shall constitute a prima facie proof of the occurrence of the event.") (emphasis supplied);

- Ala. Code § 13A-12-190(12) (1975) (1994 Replacement Vol.) ("Matter. Any book, *magazine*, *newspaper*, or other printed material . . . that either are or contain a photographic or other visual reproduction of a live act, performance, or event.") (emphasis supplied);

- Ala. Code § 13A-12-200.1(15) (1975) (1994 Replacement Vol.) (2002 Supp.) ("Material. Any book, *magazine*, *newspaper*, printed or written matter, writing description, picture, drawing . . . .") (emphasis supplied);

- Ala. Code § 16-6B-10(a)(5) (1975) (2001 Replacement Vol.) ("Expenditures may include books, book binding, repair, CD Roms, computer software, computer equipment, cataloging, audio-visual materials, *newspapers*, *magazines*, recordings, and video tapes.") (emphasis supplied);

- Ala. Code § 16-13-231(a)(b)(2)(c) (1975) (2001 Replacement Vol.) ("Other expenditures may include . . . *newspapers*, *magazines*, recordings, and video tapes.") (emphasis supplied);

- Ala. Code § 17-22A-2(a)(2)(b)(5) (1975) (1995 Replacement Vol.) (2002 Supp.) ("[T]his subparagraph shall not apply . . . in *newspapers*, *magazines*, or other similar types of general public political advertising.") (emphasis supplied);

- Ala. Code § 17-22A-2(a)(4)b.1 and 7 (1975) (1995 Replacement Vol.) (2002 Supp.) ("1. Any news story, commentary or editorial prepared by and distributed through the facilities of any broadcasting station, *newspaper*, *magazine*, or other periodical publication . . . . 7. . . . this subparagraph shall not apply . . . in *newspapers*, *magazines*, or other similar types of general

-46-

public political advertising.") (emphasis supplied);

- Ala. Code § 20-2-143(d) (1975) (1997 Replacement Vol.) ("Advertisement. It is unlawful for any person to place in any *newspaper*, *magazine*, handbill or other publication . . . any advertisement or solicitation with reasonable knowledge that the purpose of the advertisement or solicitation is to promote the distribution or sale of an imitation controlled substance.") (emphasis supplied);

- Ala. Code § 23-1-7(d) (1975) (2000 Replacement Vol.) ("This section shall not be construed as repealing the provisions of Chapter 7 of Title 41 which prohibit the purchase of advertising in *newspapers*, *magazines*, programs or other periodicals published in the state with funds appropriated for tourist advertising.") (emphasis supplied);

- Ala. Code § 25-8-39 (1975) (2000 Replacement Vol.) ("No person under 14 years of age shall distribute, sell, expose, or offer for sale *newspapers*, *magazines*, periodicals, candy, or other articles . . . .") (emphasis supplied);

- Ala. Code § 27-2B-9(b) (1975) (1998 Replacement Vol.) ("[T]he making, publishing, disseminating, circulating, or placing before the public, or causing, directly or indirectly to be made, published, disseminated, circulated, or placed before the public, in a *newspaper*, *magazine*, or other publication . . . is therefore prohibited.") (emphasis supplied);

- Ala. Code § 28-3-16 (1975) (1998 Replacement Vol.) ("There shall be no advertising of alcoholic beverages . . . except through *newspapers*, *magazines*, radio broadcasting stations, commercial vehicles used for transportation of alcoholic beverages and billboards located in 'wet' counties . . . .") (emphasis supplied);

- Ala. Code § 28-7-23 (1975) (1998 Replacement Vol.) ("Radio, television, *newspaper*, *magazine*, billboard and commercial vehicles used for transportation of table wine may be used to advertise table wine in accordance with rules and regulations issued by the board . . . .") (emphasis supplied);

- Ala. Code § 37-3-4(a)(6) (1975) (1992 Replacement Vol.) (2002 Supp.) ("This

chapter shall not be construed to apply to: . . . (6) Motor vehicles while used exclusively in the transportation of *newspapers* and *magazines* and United States mail.") (emphasis supplied);

- Ala. Code § 38-1-4(c) (1975) (1992 Replacement Vol.) ("Unlawful disclosure or use of names. – Except as provided in this section, it shall be unlawful for any person . . . to solicit . . . use of, any lists or names for . . . publication in any *newspaper*, *magazine*, other periodical or otherwise, or for any purpose not directly connected with the administration of public assistance.") (emphasis supplied).